UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOSEPH RAINWATER                                                    PLAINTIFF

VS.                              Civil No. 2:14-cv-02070

CAROLYN W. COLVIN                                                  DEFENDANT
Commissioner of Social Security Administration

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Joseph Rainwater, brings this action under 42 U.S.C. §405(g), seeking judicial review

of a decision of the Commissioner of the Social Security Administration ("Commissioner")

denying his claim for disability insurance benefits ("DIB") and supplemental security income

("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C.

§423(d)(1)(A), 1382c(3)(A).  In this judicial review, the court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision. *See* 42

U.S.C. §405(g).

## I.      Procedural Background:

Plaintiff filed his application for DIB and SSI on January 23, 2012[1], alleging an onset date of

March 1, 2008, due to hypertension, chronic obstructive pulmonary disease ("COPD"), obesity

and depression. (T. 23) Plaintiff's application was denied initially and on reconsideration. (T. 89,

92, 100-101, 102-103).  Plaintiff then requested an administration hearing, which was held in front

of Administrative Law Judge ("ALJ"), Harold D. Davis on February 12, 2013.

---

[1] A prior application for disability was filed on December 11, 2006. On December 28, 2011, the Hon. James
Marschewski, United States Magistrate Judge, found substantial evidence supporting the ALJ's decision of March 3,
2009, denied Plaintiff benefits, and affirmed the ALJ's decision.

At the time of the hearing, the Plaintiff was 42 years of age and possessed the equivalent of a high school education. (T. 44) During the hearing, Plaintiff's counsel moved to amend the onset date of March 1, 2008 to September 30, 2009, which the ALJ granted. (T. 43) He had past relevant work ("PRW") experience as a draw bench operator helper, shoveling dirt at a sand and gravel company, poultry clean up worker and a chicken hanger. (T. 46-48)

On April 12, 2013, the ALJ concluded that, although severe, the Plaintiff's hypertension, COPD, obesity and depression did not meet or equal any Appendix 1 listing. (T. 22-23) The ALJ determined that Plaintiff maintained the residual functional capacity ("RFC") to perform light work, except he needed to work in a controlled environment, where he would not be exposed to dust, fumes or temperature extremes. (T. 23-30) With the assistance of a vocational expert, the ALJ then found that Plaintiff could perform work as a dishwasher and a fast food worker. (T. 31-32) Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on March 19, 2014. (T. 1-4). Subsequently, Plaintiff filed this action on March 28, 2014. (Doc. 1) This matter is before the undersigned for Report and Recommendation.  Both parties have filed appeal briefs, and the case is ready for decision. (Doc. 9 and 10)

## II.   <u>Applicable Law:</u>

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."

*Cox v. Astrue,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003).  The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young* at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that he is unable to perform either his past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The Commissioner's regulations require application of a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of

impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.   Evidence Presented:

On March 21, 2007, Plaintiff's went to Good Samaritan Clinic ("GSC") as his cough continued, and he was convinced he had cancer. (T. 370) Dr. Stephanie Russell noted he was a smoker and had been treated for bronchitis in January 2007. Plaintiff stated he had cut back to half of a package of cigarettes per day. Dr. Russell noted paranoid thoughts and diagnosed him with abnormal thinking. She recommended a psychological evaluation, but noted "Plaintiff doesn't want to hear that." (T. 370)

On May 22, 2007, Plaintiff was treated at GSC for recurrent bronchitis. (T. 369) He was out of Albuterol. Over the previous two weeks, his cough had become productive. Plaintiff also complained of shortness of breath. It was noted that he had problems with anxiety and depression, was seeing a psychiatrist, and had applied for disability. Plaintiff was diagnosed with acute bronchitis and asthma and prescribed Doxycycline. (T. 369)

On May 31, 2007, a CT scan of his head was negative, showing only mild atrophy. (T. 339) A chest x-ray was also within normal limits, evidencing no active infiltrates, a normal heart size, and well expanded lungs. (T. 340)

On June 6, 2007, records indicated Plaintiff had become hypertensive at Western Arkansas Counseling and Guidance Center ("WACGC") and was sent to the emergency room. (T. 368) He had been admitted to the hospital for cardiac monitoring and testing.  Plaintiff indicated that the Norvasc they prescribed was too expensive for him to fill.  A review of his treatment records indicated that Plaintiff had primarily been normotensive when evaluated by his primary care physicians at GSC.  Plaintiff was smoking eighteen cigarettes per day, drinking six to eight Cokes daily, and reported swelling in his feet.  An examination revealed a heavy habitus, poor dental hygiene, poor overall hygiene, an occasional irregular heartbeat, fair femoral pulses, weak pedal pulses, and some edema of the feet.  It appeared there was some question regarding his most recent blood work.  The doctor indicated that the blood sample was diluted, and noted the possibility of water intoxication.  He prescribed Atenolol and advised Plaintiff to decrease his intake of Coke and water. (T. 386)

On June 7, 2007, Plaintiff presented for a psychiatric evaluation with Dr. Pearl Beguesse, a staff psychiatrist at WACGC. (T. 378-380) He continued to report symptoms of depression, sadness, crying spells, poor sleep, decreased appetite, lack of interest in doing things, hopelessness, helplessness, worthlessness, and suicidal thoughts.  Plaintiff reported a childhood history of court-ordered treatment for behavioral problems, after attacking a principal.  However, he denied psychotic or manic symptoms, as well as prior hospitalization for psychiatric issues.  Plaintiff reported numerous suicide attempts by overdose on drugs.  His history included tobacco abuse, alcohol abuse, cannabis use, cocaine use, methamphetamine use, and prescription drug abuse.  Plaintiff stated he had not used any alcohol or drugs in over three months.  Dr. Beguesse noted good grooming and hygiene.  Plaintiff was cooperative, pleasant, maintained good eye contact,

had normal speech, a "pretty good" mood, a broad and non-congruent affect, logical and goal-directed thoughts, full orientation, and good judgment and insight.  Hallucinations and delusions were denied.  Dr. Beguesse diagnosed Plaintiff with depressive disorder not otherwise specified, nicotine dependence, cannabis dependence in early full remission, methamphetamine dependence in sustained full remission, cocaine dependence in sustained full remission, and personality disorder not otherwise specified.  She assessed Plaintiff with a Global Assessment of Functioning ("GAF") of 50 and prescribed Fluoxetine to help his symptoms. (T. 378-380)

On June 18, 2007, Plaintiff underwent a mental diagnostic evaluation with Dr. Kathleen Kralik. (T. 303-311) Plaintiff alleged problems associated with antisocial personality disorder, paranoid schizophrenia, depression, fatigue, and chronic pain.  Dr. Kralik noted that he seemed very invested in diagnostic labels.  Plaintiff admitted researching psychiatric conditions, and indicated that his reference to paranoid schizophrenia was the result of an online questionnaire for schizophrenia.  However, throughout the exam, Plaintiff brought up no symptoms suggestive of psychosis or schizophrenia.  In fact, he reported no psychotic-like symptoms until the very end of the exam.  Records reveal no medications prescribed to treat psychotic-like symptoms and Dr. Kralik noted no apparent distress or behavior suggestive of chronic mental illness of psychotic proportions.  Plaintiff frequently reported various physical symptoms when advised that the examination's focus was on mental issues.  And, when asked if there were any mental reasons he could not work, he stated that he believed he had mental defects.  Upon further probing, Plaintiff stated that he felt he was bipolar and "definitely schizophrenic."  Plaintiff stated that he did not like people, felt scared all of the time, was nervous a lot, was scared all of the time, slept odd hours, and was consistently tired. (T. 303-311)

Plaintiff denied any current use of drugs or involvement in illegal activity with a "subtle smirk," leading Dr. Kralik to believe there might be some reality base to his fears regarding his safety. However, she noted that his alleged symptoms seemed consistent with alcohol and methamphetamine-induced psychotic-like symptoms. He seemed genuine in his report of depression, though his report of this and fears of passing out seemed more along the lines of an adjustment disorder, more so than a full blow mood disorder. Most of his other allegations seemed either associated with medical issues, not credible, and/or not described in any manner suggesting they prohibit employment. Dr. Kralik opined that the timing of his application for benefits also seemed suspect. She stated that had his drug activities been continuing, this might explain his part-time work schedule (i.e., to provide access to his customers) and his concerns over lost income if he was being more carefully monitored now by law enforcement. It was, however, her opinion that he did qualify for a diagnosis of antisocial personality disorder.

Dr. Kralik diagnosed Plaintiff with polysubstance dependence, allegedly in full remission; adjustment disorder not otherwise specified with mild to moderate impact on occupational functioning with the institution of Prozac; and, antisocial personality disorder. She also assessed him with a GAF score of 51-60. Dr. Kralik concluded that Plaintiff's adaptive functioning/activities of daily living were somewhat impaired secondary to his antisocial tendencies, his social functioning was somewhat impaired for occupational purposes (manipulative and oftentimes not credible), his communication skills adequate, his capacity to cope with the typical mental/cognitive demands was adequate, his ability to attend and sustain concentration on basic tasks was adequate, his capacity to sustain persistence in completing tasks was somewhat impaired due to motivational issues, and his capacity to complete work-like tasks

within an acceptable timeframe was somewhat impaired due to volitional motivation issues.   As for the validity of the exam, Dr. Kralik noted that Plaintiff's vestiges of intelligence with associated manipulative cognitive adeptness seemed much more prominent and credible than most of his complaints regarding mental symptoms.   It was unclear to what extent exaggeration and/or malingering were reflected in his reports, however, even if his symptoms were taken at face value, she noted that Plaintiff acknowledged that his mental symptoms did not preclude occupational functioning.   She also found him unable to manage funds without assistance, due to his strong antisocial tendencies, implied interest in building bombs from what he had learned on the internet, and extensive history of methamphetamine manufacture and polysubstance trafficking and abuse. (T. 303-311)

On June 27, 2007, a physician's progress note indicated that Plaintiff was doing better with fewer headaches and improved sleep. (T. 367) Records indicate he sold his plasma weekly.   The doctor did note some trace edema in his limbs.   Plaintiff was diagnosed with mild hypertension and given refills of Atenolol and Proventil. (T. 367)

On August 17, 2007, Plaintiff returned to Dr. Beguesse for medication management. (T. 385-386) Plaintiff had been busy doing yard work, watching television, playing with his cats, and seeing his girlfriend and children.   He felt "kind of" depressed; had a broad, sad, and congruent mood; normal speech; good eye contact; fair concentration; and, good judgment and insight.   His medication was noted to be effective for his targeted symptoms, and he was taking his medications as prescribed.   Dr. Beguesse added Trazadone to help him sleep and increased his Prozac to help alleviate his depressive symptoms. (T. 385-386)

A chest X-ray performed on October 23, 2007, showed no evidence of acute infiltrates or interstitial edema. (T. 332) There was no roentgenographic evidence of acute cardiopulmonary disease. (T. 332)

On November, 7, 2007, while Plaintiff was treated at WACGC, he indicated he had been kind of depressed due to stressors of his pending disability and father's illness.  He also reported hearing voices.  His sleep and appetite were ok and he passed the time by playing chess on-line, putting plastic on windows, repairing cars, seeing his girlfriend, and taking care of the new kittens. He had no new complaints and he felt like his medication was helping. (T. 389-390)

The doctor at GSC diagnosed him with bronchitis on December 28, 2007, and prescribed Albuterol via nebulizer treatments and Doxycycline. (T. 362) On February 13, 2008, Plaintiff was diagnosed with chronic bronchitis, prescribed Atenolol, and ordered lab tests and a tuberculosis test.  At this time, Plaintiff was smoking one half of a package of cigarettes each day. (T. 361)

Plaintiff's tuberculosis test was negative and his lungs were clear, on February 15, 2008. (T. 360) The doctor diagnosed him with chronic bronchitis and advised him to stop smoking.  Notes indicated that the doctor was awaiting some lab results, which ultimately revealed low levels of protein, calcium, cholesterol, and LDL.  The doctor noted this to be consistent with selling plasma twice per week. (Tr. 360, 678)

On March 12, 2008, Plaintiff reported he no longer heard the voices that said mean things and told him to hurt himself.  He only heard pleasant voices at the time of the appointment.  He had no complaints and felt like the medications were helping. (T. 393)

A CT of Plaintiff's chest conducted on April 3, 2008, revealed no acute cardiopulmonary pathology.  There was, however, some fatty infiltration of the liver. (T. 315)

On August 15, 2008, Plaintiff underwent an intake assessment with Dr. Eva Beyga at WACGC. (T. 381-384) Dr. Beyga noted that Plaintiff appeared to be withdrawn and depressed.  He was unmotivated and appeared to have very poor insight into his illness.  However, he denied any recent drug use and reported compliance with his prescribed medications.  Plaintiff did admit to noncompliance with his therapy sessions.  He endorsed symptoms of depression and occasional auditory hallucinations.  His affect was flat and inappropriate, his mood depressed, his thought processes tangential, his thought content negative, and his judgment and insight impaired.  Dr. Beyga found no evidence of delusions.  Plaintiff's remote and immediate memory appeared impaired, as he experienced difficulty reporting his medical history. His intelligence appeared to be below average, he exhibited cognitive deficits possibly consistent with chronic mental illness, his immediate memory was impaired, and he experienced difficulty concentrating.  Dr. Beyga diagnosed Plaintiff with depressive disorder not otherwise specified, rule out major depressive disorder, psychotic disorder not otherwise specified, polysubstance dependence in full sustained remission, inhalant-induced anxiety disorder, nicotine dependence, rule out malingering, and rule out antisocial personality disorder.  Plaintiff was assessed with a GAF of 45.  The doctor noted that Plaintiff had continued to experience depressive symptoms, in spite of being compliant with his medications.  Therefore, he tapered Plaintiff off of the Prozac, prescribed Celexa, adjusted his Risperidone dosage, and advised him to continue taking Trazodone. (T. 381-384)

Plaintiff went to WACGC for medication evaluation for refills, compliance, side effect profile, and effectiveness of medications on October 20, 2008.  Plaintiff appeared to be less depressed, denied psychotic symptoms, yet, he complained of initial and middle of the night insomnia. (T. 395) Despite being compliant with medications, he experienced increased irritability and had

difficulty controlling his anger. Due to his history of impulsive behavior and unstable moods, the doctor prescribed Depakote ER. (T. 395-396)

Despite being in compliance with prescribed medications on December 22, 2008, Plaintiff still felt depressed, tired and unmotivated.  He continued to have periods of initial and middle of the night insomnia.  Dr. Beyga observed the Plaintiff to be disheveled with fair grooming and hygiene. Dr. Beyga recommended Plaintiff continue taking medication as prescribed for the duration of the treatment. (T. 397-399)

On April 28, 2009, Plaintiff complained of a sore throat, dizziness, and night sweats.  His blood pressure was 140/92 and he weighed 282 pounds.  He wanted a note from the doctor stating he had discontinued his blood pressure medication so he could sell plasma.  The doctor refused to give him a note and instead, advised him to restart his blood pressure medication. The doctor, assessed Plaintiff with an upper respiratory infection, and bronchitis. (T. 356)

On July 21, 2009, Plaintiff had an irritated throat, congestion, productive cough, and night sweats.  His blood pressure was 136/88 and he weighed 276 pounds.  Plaintiff was assessed with bronchitis and depression and prescribed Doxycycline, Albuterol and Prozac. (T. 355)

On September 8, 2009, Plaintiff reported having a sore throat, weakness, sweat attacks at night, chills, and a productive cough. Plaintiff's blood pressure was 128/80 and he weighed 262 pounds. (T. 354) Plaintiff had two X-rays taken of his chest.  The results showed some minimal chronic peribronchial thickening, unchanged from the October 10, 2007 exam, no acute cardiopulmonary disease and the heart was normal. (T. 320)

On September 22, 2009, Plaintiff followed up regarding his pharyngitis and he was out of his inhaler.  He was still smoking, but felt better.  With regard to his hypertension, he had taken his

11

morning dose, but not the afternoon, the doctor noted it was usually well controlled.  Plaintiff had lost 19 pounds since April 28, 2009.  The doctor encouraged him to stop smoking (T. 353)

On February 16, 2010, Plaintiff reported more compliance with prescriptions, including those prescribed by WACGC.  He reported hearing voices and feeling odd.  Plaintiff stated was previously on Risperidone and other medications. (T. 352) He indicated he had stopped smoking cigarettes and was only pipe smoking.  He denied any suicidal ideation plans or thoughts of harming others. (T. 352) The doctor's notes indicated Plaintiff was unkempt, disheveled and malodorous. He had an odd affect with frequent circuitous answers.  The doctor indicated Plaintiff was not compliant with hypertension, as his blood pressure was 130/99, thus, he was prescribed Lopressor and Hydrochlorothiazide, he was counseled on his smoking and he likely had schizophrenia.  The doctor recommended him return to WACGC. (T. 352)

On May 20, 2010, Plaintiff reported he had not continued with WACGC, as previously instructed.  He tested positive for marijuana, had an episode of flushing, profuse sweating, and had an uncomfortable feeling. (T. 321, 351) He reported no help from Prozac for his depression.  He denied being suicidal. (T. 351) Plaintiff was counseled on his tobacco, and controlled substance use, he was prescribed Busprone for his depression, schizophrenia (illegible) likely, and was encouraged to return to WACGC as soon as possible. (T. 351, 552, 635)

Plaintiff reported he was taking Bupropion through his mother's prescription and Ventolin through a friend on July 1, 2010. (T. 350) He reported he was unable to afford his medications.  The doctor assessed his COPD was stable, hypertension was stable, depression was stable on Wellbutrin and he was counseled about his tobacco abuse. (T. 350, 551, 634)

12

On August 30, 2010, Plaintiff reported he was out of his medications and unable to afford them. He needed assistance with the respiratory inhaler and antidepressant. He had taken himself off of all medications, except antidepressant, blood pressure and inhaler. (T. 349) Plaintiff's hypertension was controlled, his COPD was to continue with current prescription and he was prescribed Paxil for his depression. (T. 349, 550, 633)

Plaintiff reported on September 20, 2010 he was on Paxil, for depression, and it caused excessive sweating. His COPD was controlled on Ventolin. (T. 348) The doctor noted Plaintiff had a longstanding history of hypertension and would restart him on Hydrochlorothiazide, and due to the excessive sweating on Paxil prescribed Busprone. (T. 348, 549, 632)

On April 1, 2011, records indicated Plaintiff was not taking medicine, and his blood pressure was slightly elevated. Plaintiff was restarted on Hydrochlorothiazide, Metoprolol and Wellbutrin for depression. (T. 347, 548, 631)

On April 28, 2011, Plaintiff's test for diabetes resulted in a high reading, and Plaintiff needed to start treatment. (T. 326) Notes on the hematology report indicated Plaintiff was a smoker and drank frequently. Plaintiff needed a phlebotomy weekly to get his hemoglobin under than 16. (T. 329)

On May 3, 2011, Plaintiff felt like he was getting a respiratory infection, he indicated he had emphysema, not asthma. (T. 547) He was counseled to stop smoking and would receive a weekly phlebotomy until his hemoglobin was under 16. He was prescribed Metformin, refilled hypertension medication, and counseled on tobacco abuse. The doctor's notes indicated he was not taking anything for his depression, and he had a history of Serotonin Syndrome. (T. 547, 630)

On May, 31, 2011, Plaintiff's hemoglobin showed an increase.  Plaintiff informed the doctor he was not taking Metformin, because he had not gotten on the med list.  (T. 346, 546) The doctor's notes indicated Plaintiff was to return all the paperwork for med assist, to stop smoking and drinking, and to start Metformin.  The doctor further noted Plaintiff had chronic bronchitis and prescribed Albuterol and Hydrochlorothiazide. (T. 346, 546, 629)

On July 14, 2011, Plaintiff complained of "spells" occurring once or twice a month where he had lost vision and passed out or fell over.  After the spells, he felt disoriented and could not remember the day.  The spells had been occurring for the past five to six years.  On two occasions, while his ears were ringing, he had lost control of his bowels.  At the time of this appointment, the doctor noted he had an odd affect and he was not taking Metformin, as Plaintiff did not believe he was diabetic. (T. 545) The doctor noted Plaintiff had diabetes mellitus, he must stop smoking and he was not going to WACGC for his depression/paranoia.  Moreover, the Paxil was making him sweat.  The doctor prescribed Wellbutrin and Chantix. (T. 628)

Plaintiff reported on August 18, 2011, he was sweating and sleeping better since he was off of Paxil, however his depression was worse.  He was only smoking ten cigarettes a day.  The doctor assessed Plaintiff's diabetes mellitus, he was taking Metformin and tolerating it well, he had cut down to ten cigarettes a day, and he was going to start Cymbalta.  The doctor also noted, his hypertension would likely normalize with a decrease in tobacco. (T. 544)

A report from the St. Edwards Mercy Medical Center indicated Plaintiff had a Spirometry in 2011[2]. (T. 585-587) The computerized interpretation showed a mild restrictive ventilatory defect. It was indicated by a finding of mildly reduced forced vital capacity. Furthermore, it showed a

---

[2] While it is clear from the report the test was conducted in 2011, the month and date are illegible. (T. 585)

normal diffusing capacity.  This was indicated by the finding of normal values for both the diffusing capacity and the diffusing capacity in relation to the lung volumes. (T. 587)

On February 16, 2012, Plaintiff had a follow up examination at GSC.  Plaintiff's hypertension was under control, he was smoking less, had tried Chantix, unsuccessfully, and he was no longer taking anything for depression.  The doctor noted in his assessment that his hypertension was under control, and his hemoglobin had increased, as he had not taken Metformin since August, 2011.  He assessed him with tobacco abuse and depression. (T. 543)

On July 31, 2012, Plaintiff wanted to try Chantix again.  He reported his hypertension caused excessive sweatiness and he could no longer get Cymbalta and Nortriptyline, and it had worked well for him. T. 625 The doctor assessed Plaintiff with depression and prescribed Celexa and Nortriptyline.  The doctor noted his hypertension was under control, he had Eustachian tube dysfunction, his tobacco use had decreased to five cigarettes per day and he would try Chantix. (T. 625)

On October 8, 2012, Plaintiff went to GSC where he reported he had tried to remove a mole himself.  He took Celexa and Nortriptyline daily, yet, he still felt "a little depressed."  His hypertension was under control.  The doctor referred him to a dermatologist for the mole removal, observed he was obese, reported his depression was stable and hypertension was under control. (T. 706)

On January 9, 2013, Plaintiff was seen at GSC for cough and nasal drainage.  The notes indicated Plaintiff was obese.  The doctor assessed the Plaintiff with bronchitis and noted Plaintiff was not taking any medication for hypertension. (T. 705)

15

Dr. Chester L. Carlson conducted a consultative examination of the Plaintiff on June 18, 2012. Plaintiff indicated he had a history of diabetes, COPD, high blood pressure, and mental problems. (T. 494) Plaintiff was five feet nine and one half inches tall and weighed approximately 261 pounds. (T. 495) Dr. Carlson placed no limitations on the Plaintiff and diagnosed him with COPD and high blood pressure, however, he noted the Plaintiff's COPD would mildly limit Plaintiff's prolonged physical activity. (T. 498)

On June 22, 2012, Terry L. Efird, Ph.D., performed a mental diagnostic evaluation on Plaintiff. During the evaluation, Plaintiff reported he applied for disability secondary to having problems with his lungs, COPD. He reported his mood was mostly numb. He enjoyed watching television and spending time on the computer. He slept an average of four to five hours a night, with a nap during the day. His appetite fluctuated and he had gained thirty pounds in the last year. He stayed tired all of the time and felt worthless. (T. 503) Plaintiff reported he had taken his medications as prescribed without any side effects. (T. 504) When asked about performing household chores, Plaintiff reported "I'm lazy." He used the microwave to make meals and ate sandwiches. He had obtained his GED. (T. 504) He denied using marijuana since 2007 or 2008. Mr. Efird observed Plaintiff was appropriately dressed and groomed, primarily cooperative, affect was appropriate, speech was within reasonable limits, thoughts were logical, relevant and goal-directed, he was alert, and oriented to person, place and time. His mood was generally normal to a bit anxious. At the time, Plaintiff denied any visual or auditory hallucinations. He reported he had heard the same voice give him counsel and that he had a lot of good ideas. (T. 504-505)

Dr. Efird opined, while Plaintiff claimed a number of symptoms of depression or anxiety, there were no remarkable indications of acute emotional distress. Based on Plaintiff's claims regarding

16

hearing voices, Dr. Efird diagnosed Plaintiff with personality disorder not otherwise specified, with antisocial traits.  He also diagnosed him with depressive disorder not otherwise specified, anxiety disorder not otherwise specified and assessed a GAF score of 55-65. (T. 506)

With regard to the effects of the mental impairments on his adaptive functions, Dr. Efird opined, Plaintiff was able to drive unfamiliar routes, shop independently, and handle personal finances.  Plaintiff communicated and interacted in a reasonably socially adequate, intelligible and effective manner.  Plaintiff had the capacity to perform basic cognitive tasks required for basic work like activities and performed most basic cognitive tasks adequately during this evaluation. He appeared to track and respond adequately to the evaluation, and completed most tasks.  Plaintiff did not appear to have a remarkable problem with persistence and he completed most tasks in an adequate time frame. (T. 507)

On June 18, 2012, Dr. Ronald Crow completed a physical Residual Functional Capacity ("RFC") assessment. (T. 513-521) After reviewing Plaintiff's medical records, he concluded the medical evidence supported a finding that the impairments were non-severe for his DIB claim and he retained the RFC for light work for the SSI claim. (T. 520) Dr. Steven Strode affirmed Dr. Crow's physical RFC assessment after reviewing the medical evidence. (T. 703)

On July 3, 2012, Dr. Paula Lynch, M.D., reviewed the records and completed a mental RFC assessment.  Dr. Lynch opined Plaintiff was able to perform basic work like tasks where interpersonal contact was incidental to tasks performed and where the complexity of tasks was learned and performed by rote, involving few variable, little judgment, and supervision was simple, direct and concrete. (T. 537-540) After reviewing the medical evidence, Abesie Kelly, Ph.D. affirmed Dr. Lynche's mental RFC assessment. (T. 702)

### IV.    Discussion:

Plaintiff contends that (1) the ALJ erred by failing to develop the record fully; (2) the ALJ conducted an improper credibility analysis; and, (3) the ALJ improperly determined the Plaintiff could perform light work, except he needed to work in a controlled environment, where he would not be exposed to dust, fumes, or temperature extremes. (Doc. 9 pp. 11-19) As each of these issues are tied to the ALJ's credibility determination in this case, we will begin our analysis with an evaluation of the Plaintiff's subjective complaints.

**Plaintiff's Subjective Complaints:**

When evaluating the credibility of Plaintiff's subjective complaints, the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 608 (8th Cir. 2001) The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitation. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)(holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

It is the ALJ's duty to determine the Plaintiff's RFC.  Before doing so, the ALJ must determine the applicant's credibility, and how the Plaintiff's subjective complaints play a role in assessing his RFC. *Pearsall v. Massanari*, 274 F.3d at 1217-18. An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1230, 1322 (8th Cir. 1984). The ALJ must give full "consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to

18

such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) and functional restrictions.  The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 739 (8th Cir. 2004)

To conduct the proper *Polaski* analysis, "[m]erely quoting *Polaski* is not good enough, especially when an ALJ rejects a claimant's subjective complaints of pain." *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir. 1995). Instead, "*Polaski* requires that an ALJ give full consideration to all of the evidence presented relating to subjective complaints." *Ramey v. Shalala*, 26 F.3d 58, 59 (8th Cir. 1994). To that end, "[w]hen making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater*, 87 F.3d 992, 995 (8th Cir. 1996) (citing *Hall*, 62 F.3d at 223). Such a finding is required to demonstrate the ALJ considered and evaluated all of the relevant evidence. *See Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995) (citing *Ricketts v. Secretary of Health and Human Servs.*, 902 F.2d 661, 664 (8th Cir. 1990)). However, if "the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion," but "acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain .... An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of

the case." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (citing *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987)).

Plaintiff contends the ALJ did not conduct a proper *Polaski* analysis, as he failed to discuss side effects of medications, summarily dismissed the Plaintiff's subjective complaints of pain and did not consider Plaintiff's financial issues as to his medical care. (Doc. 9 pp. 12-16)

Among the ALJ's findings in his Decision, was a finding that the Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. Although the ALJ employed a bit of Social Security boilerplate in stating that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision," the ALJ did appropriately address Plaintiff's credibility by examining and addressing the relevant medical evidence, application documents, and testimony at the hearing in accordance with applicable regulations, rulings and Eighth Circuit case law. (T. 26)

In applying the factors discussed in *Polaski*, the ALJ found the Plaintiff's symptoms were not entirely credible. (T. 26) In discussing his daily activities, Plaintiff indicated he sat at home on the couch, watched TV, and got on Facebook, yet, was also able to take care of his personal needs, sweep, dust, drive unfamiliar routes, shop independently, take out the trash, handle finances and fix microwave meals. (T. 26, 29-30, 507) Plaintiff even reported to Dr. Efird that when it came to household chores "I'm lazy." (T. 504) *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) (holding that inconsistencies between subjective complaints of pain and daily living patterns diminish credibility).

The record documents several instances where the Plaintiff was non-compliant in taking his prescribed medications. (T. 347, 349, 352, 356, 545, 547) *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).  Generally, if a claimant does not follow a prescribed treatment plan without a good reason, he or she will not be found disabled. 20 C.F.R. § 416.930(b) (1984). During his evaluation with Dr. Kralik, she noted Plaintiff might have exaggerated his symptoms somewhat during his evaluation. (T. 303-311) The Plaintiff also asked a doctor at GSC to write him a note stating he had discontinued his blood pressure medication so that he could see his plasma. (T. 356) *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)(ALJ may discount Plaintiff's allegations if there is evidence Plaintiff is a malinger or was exaggerating symptoms for financial gain).

The Plaintiff's argument that the ALJ failed to consider the side effects of the Plaintiff's medication is without merit, as the Plaintiff reported to Dr. Efird he had no side effects from his prescribed medication and when he did complain of side effects the doctor either stopped or changed his medications. (T. 504) Plaintiff indicated he had to stop taking Fluoxetine, as it caused Serotonin Syndrome. (T. 265) Due to the side effects, the doctors stopped prescribing Fluoxetine. On May 20, 2010, Plaintiff complained Prozac was not helping his depression, the doctors then prescribed Busprone (T. 351). On September 10, 2010, Plaintiff was taking Paxil for depression. Plaintiff complained Paxil caused excessive sweating, thus the doctor prescribed Busprone (T. 348) In November of 2012, Plaintiff was no longer able to get Cymbalta, therefore the doctor prescribed him Celexa and Nortriptyline for his depression. (T. 625) After reviewing the record, it appeared that when the Plaintiff complained of a side effect from a medication, the doctor

prescribed a different medication.  While the ALJ only discussed one instance where Plaintiff's medication was changed, there were several instances where medication was changed due to the side effects. (T. 257, 265, 348, 351, 625)

Plaintiff was counseled several times to stop smoking, yet he continued to smoke. (T. 346, 352, 357, 360, 547)  *See Johnson v. Bowen,* 866 F.2d 274, 275 (8th Cir. 1989)(Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.); *See also* 20 C.F.R. § 404.1530(a); 20 C.F.R. § 416.930(a). Further, the medical records indicated Plaintiff's COPD, diabetes mellitus and depression were controlled by medication, and his hypertension was stable with medication. (T. 350, 353, 389-390, 393, 395-396, 397-399, 543, 625, 706) *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003)(holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling)

During the hearing, the ALJ questioned Plaintiff about his use of illegal drugs.  The Plaintiff responded he had not used illegal drugs since 2008 or 2009, yet there was a positive drug test in April of 2010. (T. 46, 321).  Plaintiff further claimed the ALJ failed to consider Plaintiff's financial issues.  While the Plaintiff indicated, several times in the record, he was unable to afford treatment, the record does not reflect Plaintiff was ever refused treatment due to insufficient funds. (T. 50, 59, 277, 351) Plaintiff contends he did not have the money to receive the necessary treatment, yet, he continued to smoke cigarettes daily. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (noting that despite the claimant's claim that he could not afford medication, there was no evidence that he chose to forgo smoking three packs of cigarettes a day to help finance pain medications).

Because the ALJ's credibility determination was supported by good reasons and substantial evidence, we conclude that it is entitled to deference. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

**Development of the Record:**

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *See Haley v. Massanari*, 258 F.3d at 748. The ALJ is only required to develop a reasonably complete record. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994).

Plaintiff argues the ALJ should have sought further clarification from the Plaintiff's mental health care providers regarding the nature and severity of his depressive disorder. (Doc. 9 pp. 12) Plaintiff contends that the Plaintiff suffers from severe symptoms of depression and there should have been a more restrictive RFC. In reviewing the record, the undersigned found instances where the Plaintiff was malingering with regard to his mental health issues, he was non-compliant in taking his medication and when he did take his medication, and his depression was stable. (T. 28-30, 310, 350, 547, 706)

The Plaintiff has not demonstrated unfairness or prejudice resulting from the ALJ's failure to contact the medical health care providers to further develop the record. Such a showing is required

in order for a case to be reversed and remanded. *See Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)(absent unfairness or prejudice, we will not reverse or remand).

**<u>The ALJ's RFC Assessment:</u>**

Plaintiff next argues the ALJ failed to incorporate both the mental and physical findings of the treating physician and consulting psychologist in determining the Plaintiff's RFC. (Doc 9, pp. 17). The ALJ found that Plaintiff could perform light work, except he needed to work in a controlled environment, where he would not be exposed to dust, fumes, or temperature extremes. He had the ability to perform work where it involved simple tasks with few work changes and required only simple instructions. (T. 23) The Court has reviewed the record and finds the ALJ's RFC assessment is supported by substantial evidence.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d at 844*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC

assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart*, 361 F. 3d 1066, 1070 (8th Cir. 2004.)

In assessing the Plaintiff's RFC, the ALJ considered the Plaintiff's testimony at the hearing, disability interview, disability and function reports, difficulty breathing and sleeping, limitations as far as standing and walking, forgetfulness, paranoia, and inability to handle stress or changes in routine. (T. 24) Despite the limitations above, Plaintiff stated he was able to take care of his personal needs, fix simple meals, dust, sweep, take out the trash, drive unfamiliar routes, shop independently and handle finances. (T. 24, 29-30, 507)

The ALJ further considered the third party function report of his mother, Alice Mars and third party statements from Derrick Wells, Plaintiff's neighbor, and Tommy Walker, Jr., a friend.  The ALJ found they did not appear to be supported by objective medical evidence of the record and were given little weight. (T. 25)

In addition to the medical evidence, the ALJ considered statements from treating and examining physicians in assessing the Plaintiff's RFC.  The ALJ considered medical evidence that preceded the onset date of September 30, 2009, and discussed the treatment Plaintiff received through GCS from 2006, Dr. Kralik's evaluation in 2007, and WACGC in 2007 and 2008. (T. 26-28) The ALJ included in his determination of the Plaintiff's RFC his blood pressure readings, chest x-rays, and a CT scan of the brain and chest. (T. 26, 28) The ALJ also took into consideration the

records from WACGC, where Plaintiff indicated he needed "something" for his depression, his compliance and then non-compliance with his medication. (T. 28)

The ALJ considered medical evidence from GSC from 2009 to 2013, where a chest x-ray revealed mild chronic peribronchial thickening, but no acute disease.  Furthermore, Plaintiff was sometimes compliant and sometimes non-compliant with his medication.  A doctor's note indicated his COPD, and depression were stable, hypertension under control, and he was counseled as to his tobacco abuse. (T. 28) In May 2011, Plaintiff was diagnosed with diabetes mellitus and prescribed Metformin.  In July 2011, Plaintiff indicated he was not taking the Metformin, as he did not believe he was diabetic. (T. 29) Plaintiff was non-compliant in taking his medication. In fact, in February 2012, Plaintiff was not taking anything for his depression. (T. 29)

Next, the ALJ considered the examination by Dr. Carlson, where he diagnosed him with COPD and hypertension.  While Dr. Carlson found no significant limitations on examination, the ALJ only gave his examination some weight, as the ALJ found Plaintiff would be limited to no more than light work, due to his impairments. (T. 29)

Finally, the ALJ considered the evaluation performed by Dr. Efird, where he diagnosed him with depressive disorder not otherwise specified, anxiety disorder not otherwise specified, and personality disorder not otherwise specified. Plaintiff stated he had taken his medication as prescribed without any side effects. (T. 504) Plaintiff indicated he was able to drive unfamiliar routes, shop independently, handle his finances, fix simple meals, take care of his personal needs, and perform household chores.  Dr. Efird opined the Plaintiff had the capacity to perform basic cognitive tasks required for basic work-like activities. (T. 29-30, 507)

The Plaintiff noted the ALJ failed to mention the GAF score in determining the Plaintiff's RFC. The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010). While the ALJ did not specifically discuss the Plaintiff's GAF scores in his decision, he considered the Plaintiff's symptoms, objective medical evidence, detailed reports, third party statements, treating physician's records and consultative examinations. *See Jones v. Asture*, 619 F.3d at 973-974(An ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it.)(citing *Hudson ex rel. Jones v. Barnhart,* 345 F.3d 661, 666 (8th Cir. 2003); See *Jones v. Asture*, 619 F. 3d at 973-974(While a GAF score may be of "considerable help," it is not "essential" to determining an individual's residual functional capacity.)(citing *Kornecky v. Comm'r of Soc. Sec.,* 167 Fed.Appx. 496, 511 (6th Cir. 2006))

While it is the ALJ's duty to develop the record, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five. *Harris v. Barnhart,* 356 F.3d 926, 931 n. 2 (8th Cir. 2004). Based on the medical evidence, the state-agency evidence, and the testimony of the Plaintiff, the RFC determined by the ALJ is supported by substantial evidence.

## V.    <u>CONCLUSION</u>

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's Decision denying the Plaintiff benefits. It is recommended that the ALJ's Decision be affirmed, and that Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 31st day of March, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE